1  Jennifer A. Reisch (State Bar No. 223671)
   E-mail: jennifer@jenniferreischlaw.com
2  **REISCH LAW**
   180 Grand Avenue, Suite 1380
3  Oakland, CA 94612
   Tel: 510.686.3082
4  Fax: 510.444.9301

5  Samantha Martinez (*pro hac vice application forthcoming*)
   E-mail:  sam@mtzfirm.com
6  **MARTINEZ FIRM, PLLC**
7  325 Heights Blvd.
   Houston, TX  77007
8  Tel: 713.333.3270
   Fax: 713.333.3275
9

10  *Attorneys for Plaintiff*

11
                    UNITED STATES DISTRICT COURT
12
                 NORTHERN DISTRICT OF CALIFORNIA
13
                      SAN FRANCISCO DIVISION
14

15  BRIDGET MICHELLE REYNAUD,              Civil Action No.: 3:24-cv-00700

16          Plaintiff,                     **COMPLAINT FOR DAMAGES AND
                                           EQUITABLE RELIEF**
17          v.
                                           **DEMAND FOR JURY TRIAL**
18  RIVERBED TECHNOLOGY, LLC, d/b/a
19  RIVERBED,

20          Defendant.

21

22

23

24

25

26

27

28

1  Plaintiff Bridget Michelle Reynaud, by and through her attorneys, Reisch Law and Martinez

2  Firm, PLLC, alleges as follows:

3  **<u>NATURE OF THE ACTION</u>**

4  1.  Plaintiff Bridget Michelle Reynaud ("Plaintiff" or "Reynaud") brings this action to

5  hold Defendant Riverbed Technology, LLC ("Defendant" or "Riverbed") accountable for

6  discriminating against Reynaud because of her sex and retaliating against her for opposing gender

7  discrimination.  As Riverbed's former Vice President for Global Field Operations, Reynaud

8  advocated for a well-qualified female employee on her team to be promoted, but her male manager

9  and Riverbed's male CEO dismissed that recommendation and told Reynaud the female employee

10  lacked "an executive presence."  When Reynaud expressed concerns about the fairness of this

11  decision and pointed out the lack of gender diversity on her manager's team to her manager, the

12  CEO, and Riverbed's Vice President of Human Resources, her concerns were dismissed.  Rather

13  than taking steps to investigate and respond to Reynaud's complaint, Riverbed retaliated against her.

14  Soon after Reynaud communicated her opposition to the discriminatory decision to deny her female

15  colleague's promotion and expressed concern about the lack of diversity on her manager's team,

16  Riverbed put Reynaud under investigation and subsequently fired her over a single transaction that

17  involved several other male employees, including Reynaud's boss, who were equally responsible or

18  more culpable yet received no discipline over the same incident.  Finally, adding insult to injury,

19  after unlawfully terminating Reynaud's employment and defaming her, Riverbed then filed a

20  meritless suit against Reynaud in arbitration, seeking repayment of a retention bonus it had paid her

21  more than one year prior to her termination, which it lost.

22  2.  Plaintiff alleges violations of the Title VII of the federal Civil Rights Act of 1964, 42

23  U.S.C. § 2000e *et seq.* ("Title VII") and the California Fair Employment and Housing Act, Cal. Gov.

24  Code §§ 12940 *et seq.* ("FEHA") based on Riverbed's discrimination against her based on her

25  sex/gender and Defendant's retaliation against her for opposing unlawful employment practices

26  under these statutes.  Plaintiff also alleges claims for failure to take all reasonable steps to prevent

27  discrimination and for wrongful discharge in violation of public policy.  Plaintiff seeks all

28

appropriate relief, including backpay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

3.      Plaintiff demands a jury trial on all claims so triable.

**PARTIES**

4.      Plaintiff Bridget Michelle Reynaud ("Reynaud" or "Plaintiff") is a woman and a U.S. citizen who is a technology executive and resides in The Woodlands, Texas.  At all times relevant to this complaint, Plaintiff was an employee within the meaning of Title VII and FEHA.

5.      Defendant Riverbed Technology, LLC ("Riverbed" or "Defendant") is a Delaware corporation with its principal place of business and corporate headquarters in San Francisco, California.

6.      Riverbed employed Reynaud as Vice President, Global Field Operations, from November 30, 2020 to August 19, 2022.

7.      At all relevant times mentioned herein Defendant was Reynaud's employer within the meaning of the Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(b); and the FEHA, Cal. Gov. Code § 12926(d).

**JURISDICTION AND VENUE**

8.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1343, and 42 U.S.C. § 2000e-5(f)(3).

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims, including her claims under FEHA, pursuant to 28 U.S.C. § 1367, because these claims form part of the same case or controversy as Plaintiff's federal law claims under Title VII.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b). Riverbed conducts substantial business in San Francisco, which is also its global corporate headquarters. Furthermore, a substantial part of the events or omissions giving rise to the claims alleged herein, including the decisions to investigate Plaintiff's allegedly wrongful behavior following her complaints regarding gender equity at Riverbed and to unlawfully terminate her, occurred within the Northern District of California.  Additionally, most of the unlawful employment practices alleged herein were committed here, and the employment records relevant to those practices are maintained and administered here.

11.     At all relevant times, Riverbed has continuously had at least 15 employees in California and the United States.  Upon information and belief, Riverbed's California headquarters maintains control, oversight, and direction over the operation of its facilities and over all of the employment practices, policies, and decisions that are relevant to this complaint.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.     Plaintiff has exhausted her administrative remedies and complied with prerequisites to maintain her Title VII and FEHA claims.

13.     On June 15, 2023, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") EEOC Charge No. 550-2023-02485.  The EEOC Charge was filed in a timely manner because Plaintiff filed her EEOC Charge within 300 days of her August 19, 2022 termination.

14.     Plaintiff's EEOC charge was dual-filed with the California Civil Rights Department, formerly known as the Department of Fair Employment and Housing (hereinafter, "CCRD"), which issued an immediate right-to-sue for her claims of sex/gender discrimination and retaliation under the FEHA on June 15, 2023, attached hereto as **Exhibit 1**. The CCRD complaint was filed in a timely manner pursuant to Cal. Gov. Code § 12960(e)(5) insofar as it was filed within three (3) years of the last date that Plaintiff was subjected to unlawful discrimination and/or retaliation under the FEHA.

15.     The EEOC issued to Plaintiff a Notice of Right to Sue on November 9, 2023, attached hereto as **Exhibit 2**.

16.     Plaintiff timely files this Complaint within 90 days of receiving the November 9, 2023 Notice of Right to Sue from the EEOC and within one year (365 days) of her receipt of the Right to Sue from the CCRD.

## FACTUAL ALLEGATIONS

**Reynaud's Background and Experience at Riverbed**

17.     Reynaud is a technology executive with extensive experience in sales operations.  She began her work in this field after working for a combined 26 years at two of the world's largest hardware and software companies, where she was promoted more than ten times.  One of Riverbed's executives recruited her to work for the company based on his positive experience working with her

at a prior company.

18.     Riverbed is an international, billion-dollar technology company based in San Francisco that sells and services networking systems to businesses.  It hired Reynaud as its Vice President of Global Field Operations, reporting briefly to a Vice President and then to its Chief Operations Officer and later its Chief Revenue Officer ("CRO").  Reynaud was charged with improving Riverbed's systems and processes used by the company's worldwide sales team.  After seeing Reynaud's capabilities, Riverbed's leaders tasked Reynaud with important projects outside of her role.  Toward the end of her employment, she was asked to oversee long-tenured employees who ran the "deals desk" in charge of reviewing large deals.

19.     Riverbed went through bankruptcy in 2021.  To ensure its key personnel remained in place, it paid retention bonuses.  Reynaud was selected for a retention bonus, which Riverbed paid to her in October 2021.

20.     In recognition of her excellent work, Riverbed also paid Reynaud a yearly bonus and increased her salary in April 2022.

**Reynaud Points Out Problems with Gender Diversity and Opposes Riverbed's Discriminatory Refusal to Promote Female Employee**

21.     Throughout her employment at Riverbed, Reynaud was one of the few women in leadership positions at the company.  During Plaintiff's time at the company, Riverbed's Chief officers were all white men.

22.     In late 2021 and early 2022, Reynaud advocated for one of her female subordinates to be promoted.  Reynaud expected for Riverbed's male leadership, including her manager, the Chief Revenue Officer (CRO), and the then-Chief Executive Officer (CEO), to support this promotion because the candidate was highly qualified, had achieved all the goals that had been set for her, and because promoting her would help to rectify the company's poor showing and underrepresentation of women in leadership.  However, they did not.

23.     Reynaud sent an email to the CRO, the male CEO, Dan Smoot, and the male Vice President of Human Resources.  In it, she told them it would be good for the CRO to have more

diversity on his team.  The CRO then expressed surprise to her that she had sent such an email.

24.     Rather than act on Reynaud's recommendation, the CRO told Reynaud that the candidate would not be promoted because she lacked an "executive presence."  The candidate told Reynaud that she did not know what was meant by "executive presence," but that it appeared "you had to be an older, white man to get ahead at Riverbed."  Reynaud told the CRO that the company was giving the impression that you had to be an older, white man to get ahead at Riverbed.

25.     Nobody at Riverbed ever followed up with Reynaud about these issues she had raised.  The candidate in fact had received praise from another C-suite officer that was disregarded.

**Shortly After Reynaud Opposes Unlawful Employment Practices, Riverbed Retaliates by Conducting a Sham Investigation and Singling Her Out for Termination While Male Employees Who Were Equally or More Culpable Receive No Discipline**

26.     After Reynaud raised concerns about the company's hiring and promotion practices, Riverbed failed to investigate and managers failed to take any corrective measures.  Instead, within a couple of months after she raised these issues, Reynaud was fired for a pretextual reason.

27.     On June 30, 2022, a male Sales employee forwarded an email between him and a large client reflecting an agreement to make a substantial, multimillion dollar sale.  The forwarded email was received by the male Chief Information Officer, and the male Vice President (VP) – Global Strategic Sales.  Both leaders approved the sale in this email, and the VP – Global Strategic Sales forwarded it to Reynaud around 5 p.m. PST instructing her to book this deal.  In addition, the CRO, Reynaud's boss, told her via chat that the deal seemed solid and should be booked.  Reynaud did not normally handle booking, and she sent it to the deals desk for processing.

28.     Within ten minutes, a member of Reynaud's team told her there was not a signed contract with this customer and Riverbed should <u>not</u> book the deal.  Reynaud immediately took steps to stop the delivery of the software and to ensure the deal was not credited.  A few days later, Reynaud instructed her team to start the process to "debook" the deal, which is complex and takes some time to finish.

29.     On July 1, 2022, Riverbed's General Counsel, the CEO, and the CFO, Tom Pickett, discussed terminating Reynaud and the Sales employee who started the deal.  They did not entertain

or discuss providing any discipline at all to the three men (the CRO, the Chief Information Officer, and the VP – Global Strategic Sales) who approved the deal and told Reynaud to book it.

30.     The General Counsel then hired an investigator, who conducted a sham investigation to cover up the discriminatory decision that already had been made on July 1, 2022 to fire Reynaud and not to hold the male leaders accountable for their actions.  The investigator first interviewed the General Counsel and other Legal department employees, who explicitly told her that Reynaud was the person who should be fired.  Even though the investigator determined that Reynaud had no idea that a key contract was missing when she forwarded the June 30 email to her team to book and that she had no intent to book the sale outside the company's usual processes, the investigator recommended Reynaud receive discipline up to and including termination.

31.     After the investigation was concluded, the CEO and CFO falsely told the Riverbed Board of Directors that Reynaud had engaged in "knowingly deceptive and fraudulent behavior," even though the investigator had not made that finding, and recommended that she be fired.  Based on this false statement and recommendation, which the CEO and CFO knew to be false at the time it was made, the Board approved terminating Reynaud and Riverbed did so on August 19, 2022.

32.     Even though the investigator made determinations about various employees' wrongdoing, only Reynaud was fired.  Riverbed claimed it was going to fire the male Sales employee who said that the deal was ready to book, but instead allowed him to resign.  The other male employees who had greenlighted the deal received no discipline, save the CRO who was given a verbal warning.  Two of the three male employees involved still work for Riverbed.

**Riverbed Sues Reynaud for Retention Bonus and Loses**

33.     After Riverbed wrongfully fired Reynaud, it brought an arbitration proceeding against her to recover the retention bonus it had paid her ten months prior to her termination. Reynaud was forced to retain counsel to defend her.

34.     A hearing was held and in September 2023, the arbitrator found that Riverbed's claims were without merit.  See attached award as **Exhibit 3**.  The arbitrator found that the investigator's "strange" method of investigation raised questions about whether it was done in good

faith, and further found that Riverbed had *no basis* for trying to recover the bonus from Reynaud.

35.     Reynaud incurred attorney's fees for her defense of this claim that have not been reimbursed by Riverbed.

**The Unlawful Acts, Omissions, and Decisions of Riverbed Officers, Managing Agents, and Human Resources Personnel Emanated From California**

36.     Riverbed's corporate officers, managing agents, and human resources executives and managers who worked from California made, approved and/or ratified each of the unlawful acts, omissions, and decisions alleged in this complaint.

37.     Riverbed's CEO during Reynaud's employment, who knew about and failed to correct gender discrimination when Reynaud brought it to his attention, lives and works in California.

38.     Riverbed's human resources employees work in California from the company's San Francisco headquarters. The human resources department in San Francisco maintained Reynaud's and other employees' personnel records, as well as records of internal investigations.

39.     Riverbed's San Francisco headquarters personnel had primary fiduciary responsibility for compliance with state and federal employment laws, including Title VII and FEHA.

40.     It was in California that the Vice President of Human Resources and the CEO received Reynaud's comments objecting to the failure to promote her female colleague or rectify the lack of diversity and women in leadership roles at the company.

### First Claim for Relief

### Discrimination Based on Sex - Title VII, 42 U.S.C. 2000e, et seq.

41.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully stated herein.

42.     Title VII prohibits employers from discriminating on the basis of sex against any individual with respect to her compensation, terms, conditions, or privileges of employment.  42 U.S.C. 2000e-2(a).

43.     At all times relevant herein, Plaintiff was a female employee protected from discrimination on the basis of her sex and gender.

44.     Defendant discriminated against Plaintiff by subjecting to different treatment because of and based on her sex and gender, including by holding her to stricter standards of conduct and subjecting her to harsher discipline and by terminating her.

45.     Reynaud's sex was a motivating factor in Defendant's adverse actions against her, including its decision to terminate her employment.

46.     As a direct and proximate result of Defendant's violations of Title VII, Reynaud has suffered harm and will continue to suffer economic and non-economic damages for which Defendant is liable, including but not limited to emotional distress and the loss of past and future earnings and benefits, in an amount to be proven at trial.

47.     As a result of Defendant's unlawful acts and omissions, Reynaud is entitled to compensatory damages, equitable relief, attorneys' fees, and costs.

48.     Defendant committed the acts herein alleged maliciously, fraudulently, and oppressively, and/or with reckless indifference for Plaintiff's federally protected rights. The discriminatory practices alleged above was engaged in and/or ratified by the officers, directors, supervisors and/or managing agents of Defendant and each of them, who were acting at all times relevant to this Complaint within the scope and course of their employment. Pursuant to 42 U.S.C. § 1981(a)-(b), Defendant is liable for punitive damages and Plaintiff is entitled to recover punitive damages from Defendant in an amount according to proof.

**Second Claim for Relief**

**Retaliation - Title VII, 42 U.S.C. 2000e, et seq.**

49.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully stated herein.

50.     At all times relevant herein, Plaintiff has been a member of the group and engaged in activity protected by 42 U.S.C. section 2000e-3, which prohibits employers from discriminating against employees who oppose any unlawful employment practice under the statute.

51.     Defendant retaliated against Plaintiff by, among other tings, subjecting her to a sham investigation; making false, defamatory statements about Plaintiff with malice; terminating Plaintiff's employment and filing a baseless lawsuit against Plaintiff in bad faith.

52.     As a direct and proximate result of Defendant's violations of Title VII, Reynaud has suffered harm and will continue to suffer economic and non-economic damages for which Defendant is liable, including but not limited to emotional distress and the loss of past and future earnings and benefits, in an amount to be proven at trial.

53.     As a result of Defendant's unlawful acts and omissions, Reynaud is entitled to compensatory damages, equitable relief, attorneys' fees, and costs.

54.     Defendant committed the acts herein alleged maliciously, fraudulently, and oppressively, and/or with reckless indifference for Plaintiff's federally protected rights. The discriminatory practices alleged above was engaged in and/or ratified by the officers, directors, supervisors and/or managing agents of Defendant and each of them, who were acting at all times relevant to this Complaint within the scope and course of their employment. Pursuant to 42 U.S.C. § 1981(a)-(b), Defendant is liable for punitive damages and Plaintiff is entitled to recover punitive damages from Defendant in an amount according to proof.

**Third Claim for Relief**

**Discrimination Based on Sex and Gender - FEHA, Cal. Gov. Code § 12940, et seq.**

55.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully stated herein.

56.     The FEHA prohibits employers from discriminating against any person on the basis of sex with respect to "compensation or in terms, conditions, or privileges of employment."  Cal. Gov. Code § 12940(a).

57.     Defendant discriminated against Reynaud on the basis of sex by, among other things, holding her to stricter standards of conduct than similarly situated male employees, scrutinizing and punishing her more harshly than male employees, failing to discipline similarly situated male employees for the same conduct, and terminating her.

58.     Plaintiff's sex was a motivating factor in Defendant's adverse actions against Plaintiff, including its decision to terminate her.

59.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, acts, and omissions, Plaintiff has suffered and continues to suffer harm, including economic damages, lost past and future earnings, and emotional distress, in amounts to be proven at trial.

60.     Plaintiff is entitled to all legal and equitable remedies available for violations of the FEHA under Government Code § 12965, including backpay and compensatory damages, equitable relief, attorneys' fees and costs, including expert witness fees.

61.     Further, Defendant acted with malice, oppression, and/or reckless disregard for Plaintiff's rights, rendering punitive damages appropriate under California Civil Code § 3294.

**Fourth Claim for Relief**

**Retaliation - FEHA, Cal. Gov. Code § 12940, et seq.**

61.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully stated herein.

62.     At all times alleged herein, California Government Code § 12940(h) was in full effect and binding on Defendant.

63.     Pursuant to California Government Code § 12940(h), Plaintiff had a legal right to protest, oppose, or complain about discrimination in the workplace, without retaliation from Defendant.

64.     As a result of Plaintiff's engagement in protected activity, including her opposition to Defendant's unlawful conduct and employment practices, Plaintiff was subjected to retaliatory adverse actions by Defendant.

65.     Defendant retaliated against Plaintiff by, among other things, subjecting her to a sham investigation; making false, defamatory statements about Plaintiff with malice; terminating Plaintiff's employment and filing a baseless lawsuit against Plaintiff in bad faith.

66.     As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer harm, including economic damages, lost past and future earnings, and emotional distress, in amounts to be proven at trial.

67.     Plaintiff is entitled to all legal and equitable remedies available for violations of the FEHA under Government Code § 12965, including backpay and compensatory damages, equitable relief, and attorneys' fees and costs, including expert witness fees.

68.     Further, Defendant acted with malice, oppression, and/or reckless disregard for Plaintiff's rights, rendering punitive damages appropriate under California Civil Code § 3294.

### Fifth Claim for Relief

### Failure to Prevent Discrimination and Retaliation

### FEHA, Cal. Gov. Code § 12940(k)

69.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully stated herein.

70.     At all relevant times mentioned herein, California Government Code §§ 12940 *et. seq.* was in full force and effect and binding upon Defendant and its employees. Section 12940(k) provides that it is an unlawful employment practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination . . . from occurring."

71.     Riverbed failed to prevent, respond to, adequately investigate, and/or take appropriate corrective measures to address gender discrimination against women.

72.     Riverbed failed to adopt necessary procedures, practices, guidelines, rules, and/or trainings regarding the prevention of discrimination, harassment, and retaliation in the workplace.

73.     Through its acts and omissions, Defendant failed in their affirmative duty to take all reasonable steps necessary to prevent discrimination and retaliation from occurring, in violation of California Government Code § 12940(k).

74.     As a direct and proximate result of Defendant's unlawful acts, omissions, and conduct, Plaintiff suffered harm and will continue to suffer economic and non-economic damages for which Defendant is liable, including but not limited to emotional distress, lost past and future earnings and benefits, in an amount to be proven at trial.

### Sixth Claim for Relief

### Wrongful Termination in Violation of Public Policy

75.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully stated herein.

76.     The above-described conduct of Defendant constitutes sex discrimination, retaliation and wrongful termination of Plaintiff in violation of public policy, including FEHA and Title VII, under the common law principles explained in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 and its progeny.

77.     As a direct and proximate result of Defendant's unlawful acts, omissions, and conduct, Plaintiff suffered harm and will continue to suffer economic and non-economic compensatory damages for which Defendant is liable, including but not limited to emotional distress, lost past and future earnings and benefits, in an amount to be proven at trial.

78.     Further, Defendant acted with malice, oppression, and/or reckless disregard for Plaintiff's rights, rendering punitive damages appropriate under California Civil Code § 3294.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.  An order declaring that Defendant has engaged in sex discrimination in violation of Title VII of the Civil Rights Act and the California Fair Employment and Housing Act;

B.  An order declaring that Defendant has engaged in retaliation in violation of Title VII of the Civil Rights Act and the California Fair Employment and Housing Act;

C.  An order awarding make-whole compensatory and equitable relief for Plaintiff's past and future economic damages resulting from the unlawful practices, acts, and omissions, complained of above, including front pay in lieu of reinstatement to restore Plaintiff to her rightful position, in amounts according to proof;

D.  An order awarding Plaintiff compensation for her emotional pain, suffering, inconvenience, and humiliation, in amounts according to proof;

E.  An order awarding Plaintiff punitive damages for Defendant's malicious, oppressive and/or reckless conduct, as described above, in amounts to be determined at trial sufficient to punish, penalize and/or deter Defendant;

F.  An order requiring Defendant to provide other affirmative, equitable and injunctive relief

necessary to eradicate the effects of its unlawful employment practices;

G. Continuing jurisdiction over this action to monitor Defendant's compliance with this Court's orders;

H. Pre-judgment and post-judgment interest, as provided by law;

I. Plaintiff's reasonable attorneys' fees and costs, including expert witness fees; and

J. Such other and further relief the Court deems necessary, just, and proper.

DATED: February 6, 2024

**REISCH LAW MARTINEZ FIRM, PLLC**

By: _/s/ Jennifer A. Reisch_ /
Jennifer A. Reisch
Samantha Martinez

*Attorneys for Plaintiff*
*Bridget Michelle Reynaud*

1

## <u>DEMAND FOR JURY TRIAL</u>

2   Plaintiff Bridget Michelle Reynaud hereby demands a jury trial on all causes of action,

3 issues, and claims so triable.

4

5 DATED: February 6, 2024     **REISCH LAW**

6                 **MARTINEZ FIRM, PLLC**

7           By: _/s/ Jennifer A. Reisch /_

               Jennifer A. Reisch

8               Samantha Martinez

9

10              *Attorneys for Plaintiff*

               *Bridget Michelle Reynaud*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

## Civil Rights Department

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
www.calcivilrights.ca.gov | contact.center@dfeh.ca.gov

EEOC Number:    550-2023-02485

Case Name:    Bridget  M. Reynaud v. RIVERBED TECHNOLOGY

Filing Date:    June 15, 2023

### NOTICE TO COMPLAINANT AND RESPONDENT

This is to advise you that the above-referenced complaint is being dual filed with the California Civil Rights Department (CRD) by the U.S. Equal Employment Opportunity Commission (EEOC). The complaint will be filed in accordance with California Government Code section 12960. This notice constitutes service pursuant to Government Code section 12962.

The EEOC is responsible for the processing of this complaint. Please contact EEOC directly for any discussion of this complaint or the investigation.

### NOTICE TO COMPLAINANT OF RIGHT TO SUE

This letter is also your Right to Sue notice. **This Right to Sue Notice allows you to file a private lawsuit in State court**. According to Government Code section 12965, subdivision (c), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The lawsuit may be filed in a State of California Superior Court. Government Code section 12965, subdivision (c), provides that such a civil action must be brought within one year from the date of this notice. Pursuant to Government Code section 12965, subdivision (e)(1), this one-year period will be tolled during the pendency of the EEOC's investigation of your complaint. You should consult an attorney to determine with accuracy the date by which a civil action must be filed. This right to file a civil action may be waived in the event a settlement agreement is signed.

Be advised, CRD does not retain case records beyond three years after a complaint is filed.

# EXHIBIT 2

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Bridget  M. Reynaud**<br>**27 S. Crossed Birch Place**<br>**The Woodlands, TX 77381** | From: **San Francisco District Office**<br>**450 Golden Gate Avenue 5 West, PO Box 36025**<br>**San Francisco, CA 94102** |

| EEOC Charge No.<br>**550-2023-02485** | EEOC Representative<br>**DARLENE TURNER,**<br>**Investigator Support Assistant** | Telephone No.<br>**(650) 684-0919** |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

Less than 180 days have elapsed since the filing date. I certify that the Commission s processing of this charge will not be completed within 180 days from the filing date.

The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

November 9, 2023 -  *Scott Doughtie*

Enclosures(s)

**FOR:  Nancy Sienko**
**District Director**

cc: **Rebecca Hazard**
**Riverbed Technology**
**680 Folsom St. Suite 600**
**SAN FRANCISCO, CA 94107**

**Stefanie Puckett**
**Martinez Firm, PLLC**
**325 Heights Blvd**
**Houston, TX 77007**
**Samantha Martinez**
**Martinez Firm, PLLC**
**325 Heights Blvd.**
**Houston, TX 77007**

Enclosure with EEOC
Form 161-B (01/2022)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

# EXHIBIT 3

**AMERICAN ARBITRATION ASSOCIATION**
**Employment Arbitration Tribunal**

In the Matter of the Arbitration between

Case Number: 01-22-0005-0435

Riverbed Technology Inc.
-vs-
Michelle Reynaud

# FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the employment agreement entered into by the above-named parties, and dated November 16, 2020 and having been duly sworn and having duly heard the proofs and allegations of the parties, hereby AWARD, as follows:

**Appearances**
Each party appeared for the final hearing, with the assistance of counsel.   Riverbed appeared by its counsel Mr. James Hemphill and Ms. Daniela Welsh from Graves Dougherty Hearon & Moody, PC. Riverbed choose not to have a corporate representative present for the hearing. Ms. Reynaud appeared in person, together with her counsel Ms. Shadow Sloan from Shadow Sloan, Attorney at Law and Ms. Samantha Martinez from Martinez Firm, PLLC.

**Authority**
Riverbed and Ms. Reynaud are parties to two agreements requiring the arbitration of disputes between them. Section XII of the 2022 Key Employee Bonus Agreement requires the arbitration of "any and all disputes or claims between you and the Company and/or its agents, arising under or relating to this Agreement." Joint Exh.10. Page three of the November 16, 2020 job offer letter also broadly requires arbitration of disputes between Riverbed and Ms. Reynaud. Joint Exh. 8.

Neither side has raised any objection to arbitration, asserted that this dispute is outside the scope of either of these agreements to arbitrate, or otherwise challenged arbitrability in any way. I find that the entire dispute before me is subject to arbitration, and that I have authority to hear and decide the whole case as presented.

The parties previously agreed that certain discrimination claims asserted by Ms. Reynaud under Title VII of the Civil Rights Act of 1964 would be excluded from this arbitration, submitted to the EEOC and thereafter to the courts for determination. Pursuant to an order dated April 19,

2023, these discrimination claims are not before me, and are wholly outside the scope of this arbitration. I express no view on such claims.

**Form of Award**
Under Rule 39(c) the Association's Employment Arbitration Rules, the final award is required only to contain "written reasons." Neither the Employment Arbitration Rules nor customary arbitration practice requires a detailed analysis comparable to the discrete findings of fact and conclusions of law common in trial courts.

Ms. Reynaud's employment agreement provides that "The arbitrator shall render a written arbitration award or decision that contains the essential findings and conclusions on which the award is based." Joint Exh. 8. The arbitration clause within the Bonus Agreement is silent with respect to the form of the award. The parties previously agreed that "written reasons" under Rule 39(c) would satisfy the terms of the employment agreement. There has been no request, whether separately or jointly, for a more detailed award.

Consistent with Rule 39(c), this award discusses some of the key points, but without any attempt to address each element of each claim or defense, to address each exhibit or to evaluate each witness in detail. I write solely for the parties, who are intimately familiar with the facts. Thus the facts are mentioned only briefly, and procedural history is omitted.

**Background**
In late 2020 Ms. Reynaud was employed by Riverbed as Vice President of Global Field Operations. In October 2021, Riverbed offered Ms. Reynaud a $130,000 retention bonus under the terms of the 2022 Key Employee Bonus agreement. Joint Exh. 10. The bonus was paid up front, but under the Bonus Agreement Ms. Reynaud might be obligated to repay part or all of bonus if she ceased to be employed by Riverbed before October 29, 2022.

Riverbed fired Ms. Reynaud on August 19, 2022 and thereafter demanded the return of $101,400 of the retention bonus on the claim that she had engaged in gross negligence or willful misconduct. Ms. Reynaud declined to return the bonus, and this arbitration followed

**Bonus Agreement**
The retention bonus paid to Ms. Reynaud was subject to the terms of the 2022 Key Employee Bonus Agreement. Joint Exh. 10. The Bonus Agreement provides for the employee to repay the bonus if Riverbed fired Ms. Reynaud for "Cause" prior to October 29, 2022.

The Bonus Agreement defines "Cause" as "a good faith determination by the Board of Directors or similar governing body of the Company (the "Board"), in its sole and exclusive discretion" that Ms. Reynaud engaged in acts or omissions that were "grossly negligence (sic) or willful misconduct in the performance of your duties and services required by the Company or its affiliates or subsidiaries, including any intentional acts of discrimination or harassment."[1]

---

[1] Riverbed has never asserted that Ms. Reynaud engaged in discrimination or harassment. This clause, is therefore not in issue.

Thus, in order to trigger an obligation to repay the bonus, Riverbed must show the following four elements:
1. A determination
2. made in good faith
3. by the Board of Directors or similar governing body
4. that Ms. Reynaud had committed acts of "grossly negligence or willful misconduct."

Riverbed bears the burden of proof to show that it met all four of these conditions.  Riverbed's sole claim sounds in breach of contract – that Ms. Reynaud breached the bonus agreement by failing to return the bonus as demanded.

For the reasons briefly outlined below, I find that Riverbed has wholly failed to show that it complied with these conditions precedent under the Bonus Agreement, and therefore Riverbed has not shown the right to recover the bonus. Thus, Mr. Reynaud did not breach the contract by refusing to repay the bonus.

Multiple problems lie in Riverbed's way, many of which are the product of the limited evidence offered by Riverbed.[2]

**Board of Directors?**
The Bonus Agreement, drafted by Riverbed, requires a good faith determination by the "Board of Directors or similar governing body of the Company". Joint Exh. 10, Section III page 3. The only logical reading of the words "Board of Directors" in this sentence is to a decision made by the *full* Board of Directors.[3] Riverbed never argued that the term "Board of Directors" in the 2022 Key Employee Bonus Agreement means something other than the full board.

Riverbed offered no evidence that the full Board of Directors made any decision to fire Ms. Reynaud. Riverbed offered no evidence that the full Board of Directors made any decision to claw back the retention bonus. Riverbed offered no evidence that the full Board of Directors made any determination that Ms. Reynaud had engaged in gross negligence or willful misconduct. Riverbed offered no evidence that the full Board of Directors acted in "good faith." At the most basic level, Riverbed offered no evidence that the full Board of Directors was aware of, participated in, or made any determination related to clawing back Ms. Reynaud's retention bonus. Only one member of the Board of Directors testified – Mr. Smoot, the ex-CEO. Mr. Smoot offered no evidence as to any decision by the full Board of Directors, or even any discussion by the full Board of Directors.

In short, Riverbed wholly failed to show that the full Board of Directors was involved, in any way, in the termination of Ms. Reynaud's employment, the making of a "good faith" determination that Ms. Reynaud had engaged in gross negligence or willful misconduct or in any other way in the attempt to clawback the bonus.

---

[2] Riverbed's proof problems might have been the result of a change of control and resulting turnover of management. By all appearances, Riverbed's outside counsel represented the company with diligence and professionalism.

[3] The critical question of what is a "similar governing body" is addressed below.

**Page 3**

Thus, I find that Riverbed has failed to carry its burden of proof to demonstrate that the "Board of Directors" made a good faith determination that Ms. Reynaud engaged in gross negligence or willful misconduct in the performance of her duties and services.

**Similar Governing Body**

Given Riverbed's failure to show that the full Board of Directors took any action whatsoever, Riverbed can prevail _only_ if the Audit Committee is a "similar governing body" under the terms of the contract drafted by Riverbed.

The 2022 Key Employee Bonus Agreement does not define "similar governing body." Nothing in the 2022 Key Employee Bonus Agreement expressly delegates these decisions to a committee of the board, or to a small number of board members acting alone. Thus, in order to prevail Riverbed must show that the phrase it drafted "similar governing body" actually includes a committee of the Board of Directors.

It is a familiar and longstanding rule of contract construction that ambiguity in the terms of a contract is construed against the drafter. Riverbed failed to include within the Bonus Agreement any contractual term disclaiming this rule, or attempting to avoid the impact of its failure to be precise in drafting the agreement.[4]

Riverbed argues that the action by the Audit Committee satisfied the Bonus Agreement, which requires "a good faith determination by the Board of Directors or similar governing body of the Company (the "Board"), in its sole and exclusive discretion." Riverbed asserts the only possible line of argument available to it – that the "audit committee" is a "similar governing body" to the Board of Directors.

Several things are immediately obvious – Riverbed did not draft the contract to say Board of Directors or any committee of the board. Nor did Riverbed draft the contract to say that the determination could be made by any three members of the Board of Directors acting alone. Nor did Riverbed provide examples or a definition for the term "similar governing body."

Riverbed argues that "similar" actually means lesser component part or subdivision of a larger whole. This argument is not persuasive, at all.

In the context of the Bonus Agreement, the most natural reading of "similar governing body" is to cover the possibility of a change to a corporate structure other than a corporation, for example an LLC which does not have a board of directors. Had Riverbed intended to delegate the decision to claw back a retention bonus paid to a senior executive to a mere committee of the board of directors, it could have easily done so. But that is not what the Bonus Agreement provides.

---

[4] This omission is surprising, given that such provisions are commonplace in contracts. Here, the company prepared the contract and offered it to Ms. Reynaud. The company therefore could have easily contracted around this familiar rule of contract construction. Riverbed offered no evidence that Ms. Reynaud, or counsel on her behalf, drafted any of the language in the bonus agreement.

**Page 4**

Riverbed must live with the contract it drafted and which it signed. At best, this language is ambiguous, and under the traditional rule of contract construction, such ambiguity goes against the drafter. Another longstanding rule of contract construction permits, in the right case, the introduction of extrinsic evidence about a contract's meaning when the contract is ambiguous. Riverbed made no attempt to offer any extrinsic evidence – i.e. evidence outside the four corners of the document.

Riverbed argues that "similar" means some lesser component or subdivision of the thing referenced. This is not a common meaning of "similar." In evaluating the meaning of "similar" I consider the ordinary meaning of the word, as shown by dictionary definitions.

Riverbed offers a definition of "similar" from the long obsolete 6th edition of Black's Law Dictionary.[5] The Black's Law Dictionary definition argued by Riverbed, is comparable to the definitions discussed below. For example, the Black's Law Dictionary definition offered by Respondent includes "nearly corresponds" and "resemblance in many respects." The Audit Committee is composed of only three members of the entire Board of Directors, and is thus a mere subdivision of the Board. A subsidiary committee does not "nearly correspond" to the entire board of directors. A subsidiary committee does not "resemble in many respects" the entire board of directors.

I turn first to the Oxford English Dictionary ("OED"), widely regarded as authoritative:
> Having a significant or notable resemblance or likeness, in appearance, form, character, quantity, etc., to something stated or implied (though generally without being identical); of a like nature or kind. Of two or more persons or things: resembling or like one another. Oxford English Dictionary, s.v. "similar, adj., sense 2.a", July 2023.
> https://doi.org/10.1093/OED/8482586673

None of the definitions offered by the OED include the concept of "similar" meaning lesser than or a subsidiary component part. A mere subcommittee composed of a few members is not significantly like in form or quantity to the full Board of Directors. A mere committee with narrow scope of authority is not significantly or notably like the full Board of Directors with plenary responsibility for corporate governance.

The Merriam-Webster online dictionary offers these definitions of similar:
1. having characteristics in common: strictly comparable
2. alike in substance or essentials : CORRESPONDING
https://www.merriam-webster.com/dictionary/similar

---

[5] Riverbed offered a definition from a 30 year old obsolete edition of Black's Law Dictionary. None of the **_five_** subsequent editions of Black's Law Dictionary contain any definition for "similar."  In any event, this obsolete definition does not persuasively support Claimant's argument.

The Audit Committee is not "strictly comparable" to the full Board of Directors. Nor would I find that this committee was "alike in substance or essentials" to the full board. A three-member audit committee does not have the same characteristics of the entire Board of Directors.

The first definition of "similar" in the Cambridge English Dictionary also focuses on sameness, as opposed to lesser or partial.

> similar
> adjective
> US /ˈsɪm.ə.lɚ/ UK /ˈsɪm.ɪ.lər/
> B1 looking or being almost, but not exactly, the same:

https://dictionary.cambridge.org/us/dictionary/english/similar

Similarly, a subdivision of the board is not "almost, but not exactly, the same" as the full board.

The Audit Committee is a subdivision of the full Board of Directors. Rather than exercising plenary governance oversight for the company, the Audit Committee has only a limited scope of authority.[6] Rather than making a decision that reflects the evaluation of the entire group of directors, the decision of the Audit Committee reflects only the decision of three members. Placing the decision-making authority on the entire board ensures that the entire board makes this significant financial decision affecting key executives.

I find that the ordinary meaning of "similar" denotes something which is significantly the same as, though not necessarily exactly identical. These ordinary definitions do not suggest that a subdivision or subsidiary component is "similar" to the whole.

These definitions do, however support the most natural reading of the phrase at issue – which is that "similar governing body" was included to cover the possibility of a change in corporate form, for example to an LLC, where corporate governance does not rest in a Board of Directors, but another similar type of governing body.[7]

Riverbed offered no evidence as to the nature and scope of authority of the Audit Committee. The mere title of the committee, standing alone, suggests that it is chiefly concerned with the

---

[6] Claimant made no attempt to offer evidence of any kind that deciding whether to fire Ms. Reynaud or to claw back the retention bonus was actually within the authority of the Audit Committee. Riverbed offered no evidence that the full Board of Directors had delegated decision making authority to the Audit Committee with respect to firing Ms. Reynaud, deciding to claw back the retention bonus, or determining whether she had engaged in gross negligence or material misconduct. Nor did Respondent offer any evidence that the full Board of Directors had later ratified or adopted the decision of the Audit Committee. Nor did Riverbed make any attempt to show that the full Board used the determination made by the Audit Committee to make some separate decision or independent decision that Ms. Reynaud had engaged in gross negligence or willful misconduct. This case has been fully tried. Riverbed could have presented such evidence but made no attempt to do so.

[7] There was some evidence suggesting that Riverbed was under financial stress during the events at issue. Ultimately there was a sale of the company or other change in control. This is some evidence that Riverbed might well have had in mind the potential of a change in corporate form, as a result of some reorganization, merger or acquisition. Such a corporate transaction might easily have resulted in a change in corporate form, for example to an LLC which does not have a board of directors.

financial audit of Riverbed's books. Such a narrow focus, would not be comparable to the broad governance obligations that fall on the entire Board of Directors.

Thus, I find that Riverbed failed to show that action by the Audit Committee would satisfy the requirement Riverbed *imposed on itself* in a contract it drafted – that the decision must be made by the "Board of Directors or similar governing body."

Riverbed thus failed to carry its burden of proof to show that it met one of the conditions precedent which it contractually imposed on itself.

**"Determination" made in "Good Faith"**
Other problems lie in Riverbed's way. Even if the actual decision had been made by the correct body, Riverbed bears the burden of proof to show that there was a "determination" made in "good faith" that Ms. Reynaud had engaged in gross negligence or willful misconduct.

The Bonus Agreement imposes two related requirements. First, there must be an actual determination that Ms. Reynaud engaged in gross negligence or willful misconduct. Secondly, such determination must have been made in good faith.

Here, there is no evidence that either the entire Board of Directors or the Audit Committee actually made a determination that Ms. Reynaud had engaged in gross negligence or willful misconduct. The minutes of the relevant Audit Committee meeting were presented by Riverbed in heavily redacted form. Joint Exh. 74.  Nothing in Joint Exh. 74 suggests that the Audit Committee did anything other than decided to terminate Ms. Reynaud's employment. A decision to fire, is not a determination of gross negligence or willful misconduct.  Indeed, Claimant's two key witnesses frankly admitted that these topics were not considered by the Audit Committee, and that the Audit Committee did not consider or review the Bonus Agreement.

Even if the Audit Committee had made such a determination, there is the question of whether such determination was made in good faith. This element goes to the quality or nature of the thought process or of the decision-making process by the body that made the decision. Much lies in the assessment of the motivation of the decision-makers.

Riverbed imposed on itself the requirement that the decision be made in good faith. This is not a contract which vests the company with complete discretion to make a decision on any basis it likes.

Here, Riverbed offered no testimony from any member of the Audit Committee. That is, Riverbed has offered no evidence by anyone who actually made any decisions. Riverbed essentially asks me to assume that the Audit Committee made its decision in good faith, because those who presented information to the Audit Committee were acting in good faith. This is, at best, evidence of the information provided to the Audit Committee. This is not evidence of why or how the Audit Committee made its decision.[8] Nor is this evidence of the mental state or

---

[8] Mr. Smoot, the ex-CEO, testified that the company's in-house general counsel wanted to fire people immediately after learning of the issues related to the USAA contract being booked and before any investigation. While Mr.

motivation of the members of the Audit Committee. The minutes of the relevant meeting of the Audit Committee do not suggest that the Audit Committee made any determination of gross negligence or willful misconduct. Joint Exh. 74 is so heavily redacted that it is impossible to determine what the Audit Committee thought or how they made the decision to fire Ms. Reynaud.

Riverbed's lack of proof runs deeper. Riverbed's key witnesses Mr. Smoot (former CEO) and Mr. Pickett (former CFO) testified consistently, and credibly, that the Audit Committee did not discuss the Bonus Agreement, did not review the Bonus Agreement and did not consider whether to clawback the bonus. Mr. Pickett testified he had not seen Ms. Reynaud's bonus agreement, and that the only decision made by the Audit Committee was to terminate Ms. Reynaud's employment. The evidence of Mr. Smoot and Mr. Pickett does not support the idea that the Board of Directors or the Audit Committee made an actual determination, as required under the Bonus Agreement.

Riverbed's "independent" investigator was not aware of the existence of the bonus agreement, and was not asked to investigate anything connected with the bonus agreement. The independent investigator described her investigation method in an exceptionally odd way – she did not ask witnesses any questions.[9] She merely asked them to talk, and took notes. Thus, Ms. Reynaud had no way to know that the investigation was focused on her actions, and thus no reason to offer some details about events. This strange method of investigation, raises question about whether the investigation was itself conducted in "good faith.' Given the company's plain failure to follow the terms of the Bonus Agreement, I need not reach the question of whether the investigation was actually conducted in good faith.[10]

Thus, I find that Riverbed failed to meet its burden of proof. Riverbed affirmatively proved that the only possible decision was made by the Audit Committee, which is not a "similar governing body" to the Board of Directors. Riverbed drafted the contract, and thus bears the risk of ambiguity. Riverbed could have contractually assigned that decision to a committee of the Board of Directors, but the contract does not say that. Riverbed made no effort to offer extrinsic evidence as to the meaning of the ambiguous language.

The decision of the Audit Committee was to fire Ms. Reynaud, not to claw back the retention bonus. This limited scope is no surprise, since the company's only witnesses frankly conceded that the bonus agreement was not part of the Audit Committee's discussion or decision.

---

Smoot testified that he pushed back against that suggestion, it does suggest a rush to cast blame that requires evaluation of whether the entire process was, in fact, decided in good faith.

[9] Perhaps the investigator testified imprecisely, and her investigation really did involve her asking questions of the witnesses. This did not come out at all, even after sharp questioning by Ms. Reynaud's counsel on this specific point, or in the follow up examination by Riverbed's counsel.

[10] The investigator asserted that she conducted the investigation without any plan to reach a particular outcome. She further testified that the company had not requested her to reach any particular outcome. Even accepting such testimony as credible, the investigation method she described using was so odd as to raise questions. I do not reach the question of the investigator's good faith, as not necessary to the determination of this case.

Riverbed failed to show that the Audit Committee made an actual determination that Ms. Reynaud had engaged in gross negligence or willful misconduct. In addition, Riverbed offered no evidence from any member of the Audit Committee. There is thus a lack of proof as the motivation or thought process of the Audit Committee members, none of whom testified. For these and other reasons, I find against Riverbed on its claims against Mr. Reynaud and I DENY Riverbed's claim for the return of the bonus payment. Given that Riverbed wholly failed to meet the conditions precedent set in the contract which it drafted, Ms. Reynaud did not breach that contract in declining to return the bonus.

**Reynaud Counterclaim**

In response to Riverbed's amended statement of claims, Ms. Reynaud filed Respondent's Response to Claimant's Amended Specification of Claims. Items 9 & 10 are in the nature of a counterclaim:

> 9. Riverbed's stated reason for Ms. Reynaud's termination of employment was false and defamatory and caused damage to her personal and professional reputation.
>
> 10. Ms. Reynaud requests that the claims against her be dismissed, that the reason for her termination of employment be corrected, and that she be awarded her costs and attorney's fees.

Paragraph 9 is a counterclaim for defamation. Ms. Reynaud offered no evidence that Riverbed has communicated anything about her to any third party. Thus, any cause of action for defamation would necessarily fail.

The only evidence offered at the final hearing centered on communications within Riverbed by and among management or between company management and the company's legal counsel. Such communications are privileged. In the traditional formulation of the elements of the tort of defamation, the plaintiff must prove "publication" – that is communication of the allegedly defamatory information to a third party. This is precisely what Ms. Reynaud has <u>not</u> shown.

I find that Ms. Reynaud has not met her burden of proof with respect to any kind of defamation claim. All relief sought by Ms. Reynaud is therefore DENIED.

**Attorneys' Fees**

Riverbed did not carry its burden of proof with respect to its breach of contract claim. As Riverbed is not a prevailing party, there is no basis for any award of attorneys' fees.

Ms. Reynaud did not prevail on her counterclaim, which sounded in tort in any event. There is thus no basis to award any attorneys' fees to Ms. Reynaud.

**Administrative & Arbitrator Fees**

Under Ms. Reynaud's employment agreement, Riverbed committed to the payment of all of the Association's fees and all of the arbitrator's fees. Joint. Exh. 8, page 3.  This is effectively the same requirement as set under the Association's Employment Arbitration Rules. The Bonus Agreement does not address the fees and costs. Joint Exh. 10, Section XII.

The administrative fees and expenses of the American Arbitration Association totaling $3,350.00, shall be borne by Riverbed. As required by the Employment Arbitration Rules, the compensation and expenses of the arbitrator totaling $16,497.00 shall be borne by Riverbed. Reynaud shall bear only the filing fees (if any) previously paid to the Association.

## FINAL AWARD

1. Riverbed's claims against Reynaud are DENIED. All relief sought by Riverbed is DENIED. Riverbed's attorneys' fee claim is DENIED.

2. Ms. Reynaud's counterclaim is DENIED. There is no basis for any award of attorneys' fees to Ms. Reynaud on her counterclaim, and any such claim is DENIED.

3. Riverbed shall bear the Association's fees and the arbitrators fees as specified above.

4. This Final Award is intended to resolve all claims, counterclaims, defenses and requests for relief as submitted to this Arbitration. All relief not expressly granted, is hereby denied.

5. This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Signed: September 28, 2023

_____
Robert C. Rice
Arbitrator